A number of lawyers want to talk about this case here. A lot of you want to talk about dogfighting. This must be a common something everybody wants to talk about. All right. All right, you get your time. Watch your time as you are doing it so you don't infringe upon the time of others because the cumulative time is going to stay the same. All right, you may proceed. I take it you're Mr. Gilbert. Thank you, Judge Winn, Judge Floyd, and Judge Diaz for your time. Thank you for your time and attention today. I will be arguing Issue 1 on behalf of all the appellants, but I'm happy to take questions from the Court about, obviously, my particular case and sentencing as well. The strength of the federal judiciary comes from credibility, and the public perception of fairness greatly affects the judiciary's credibility. On page 892 of the Joint Appendix, the district court said, either the dogs have to be eliminated from the world or the people who fight the dogs or both. This was just one of the many comments in this case where the district court demonstrated and clearly showed it should have recused itself from hearing these cases pursuant to 28 U.S. Code Section 455A and B. So the record is pretty clear that Judge Ball doesn't like Pitbull dogfighting. It's pretty clear there. To put it mildly, Your Honor, it's very clear that this court displayed a deep-seated and unequivocal antagonism toward anyone charged with dogfighting. And the record, if looked at in the totality, shows that this court clearly should have stepped aside from hearing these cases. If it was so clear to you, why wasn't there an objection to the comments? Well, Your Honor, first of all, I'd like to say about three things about that. First, the judge has a sua sponte duty to recuse itself. Second, the judge sort of effectively raised the question. Well, I don't know, Your Honor. The record shows none of the counsel below objected. So I'll concede that nobody did object and no one moved for recusal. I don't want to beat it to death, but you started out like this is the worst thing in the world. And Judge Diaz says, well, why didn't you object? And you say, well, the judge is supposed to do something. Well, he is, but the counsel is representing the defendant, and that's a legitimate question. Why didn't you object if it was that bad of a situation? Again, Your Honor, I wasn't counsel down below, so I don't know. You know, we do get a lot of specialized appellate lawyers come up here. We won't let them get away with that. You put us in a plain error analysis, and, you know, under that Vitke case, you know, they use words like impatience, dissatisfaction, annoyance, and even anger. There aren't sufficient grounds to recuse. No, Your Honor. It depends if it displays a clear inability to render fair judgment. But if I could, I definitely want to answer Judge Diaz's question. First, again, the judge has a sua sponte duty himself to do this. Second, the judge effectively raised and denied that motion sua sponte. On the record on page 170 in the joint appendix, the judge asked Andrew's trial counsel, do you want me to step aside during his first Rule 11 hearing? And counsel said, no, I'm not asking you to recuse yourself. But then the judge, in that same hearing, essentially later said, well, I'll decide whether or not to send this to someone else or to hear the case later. So the judge ---- Well, but that's a little bit unfair. That was in the context of a botched plea colloquy where the defendant, that particular defendant, declined to admit guilt to the drug count. And so that caused some consternation on the part of Judge Boyle as to whether or not he should remain on the case. That's an entirely different context than the question of whether or not these comments that you have described as horrific, and I'll grant you they are a bit injudicious, but the question is whether on plain error, collectively, the comments in light of the ultimate sentence that the defendants received and the detailed orders that Judge entered explaining his sentences, whether or not we should, as a matter of plain error, grant your motion, belated motion, to recuse the judge. Well, I think it was structural error, Your Honor. And I think that no matter how this Court rules, that if you look at the plain error doctrine that it applies in this case and this Court should ---- What's your basis for saying it's structural error? Your Honor, because it ---- well, first of all, there's a Supreme Court case, Rose v. Clark, in which they found that a biased judge amounts to structural error, and that's not subject to harmless error analysis. But as this Court well knows, I mean, you know the four prongs better than anybody who comes and appears before you, but we did have error. It was clear and obvious, and it did affect the substantial rights of all of these defendants while they were being sentenced. The error did seriously affect the fairness, integrity, and, importantly, the public perception of these judicial proceedings. What is said in Federal district courts is important. The public comes to see what the courts do in Federal courts. And so the public perception of what the Court is doing is important. And I think that if you look at the comments that this Court made throughout, the many interruptions, the fact that the Court completely contradicted the evidence and spoke in the Court's own words of folklore that didn't apply to this case, demonstrate that this Court harbored a very, very deep antagonism in dogfighting cases and to all dogfighting defendants. So I'm going to ask this Court, if you do decide that it's not structural error and merits reversal, that you do find that the plain error doctrine should apply and that this Court should, in fact, accept it as plain error and act upon that error. Send it back to another trial. Just another sentencing hearing, Your Honor. They all pled guilty. So we want another sentencing hearing, and we think that this Court should definitely assign it directly to be assigned to a different judge. There was another quote that I think helps to support our position here. The Court, when the prosecutor, the prosecutor was trying to also preserve the record and I thought did a fairly good job of trying to assist the Court in this matter. When the government counsel said this breed is very loyal to owners at page 895 of the record, the Court indicated there is no good aspect to pit bulls. And I'm paraphrasing. He didn't say pit bulls. I think he said this breed. I think the breed needs to be reduced or eliminated. And then as to this sort of ties into the other question that Judge Diaz asked about, why didn't anybody move for recusal? And, again, I can't speak for the counsel below, but at one point at page 908 of the joint appendix, Mr. Richardson's counsel made his argument and specifically asked the Court, all we ask is that you punish him fairly, to which the Court immediately replied, well, I'll consider more than a five-year sentence based upon his presentation. And, in fact, he did. He fulfilled that and gave Mr. Richardson three years higher than what the government had asked for on that one. There were other comments and interruptions that further showed the likelihood of judicial bias too high to be constitutionally tolerable. Despite either contradictory evidence or a lack of facts from this record, the Court repeatedly mentioned what it referred to as folklore. The Court said, well, we know the children had been mauled by pit bulls. That was after Officer Keller, the case agent in this case, testified these dogs were not aggressive toward humans. He also then later interrupted. Wasn't there evidence in the record of a video that showed one of the dogs on a human child dummy? Yes, Your Honor. Your Honor, they did, the ASPCA, I believe, did. There was some evidence in the record about that. They did behavioral videos involving like a stuffed Labrador. Right. Well, my point is there was some evidence in the record about that. But when the judge said, we know the children had been mauled by pit bulls, that was right after Officer Keller had finished testifying and responded to a question from the government counsel and said these dogs were not aggressive toward humans. Then the judge went on to more folklore. Well, when some guy is walking down Main Street with a pit bull on a leash, your suspicions automatically get engaged. That was at page 826 of the Joint Appendix. And, of course, it was clear from the record, and Officer Keller mentioned, none of these defendants actually walked down Main Street or put these dogs in any proximity to other people. In fact, he said they don't want them to even bite the referee in the ring because then they would, you know, your dog loses the fight. And once again, the Court at page 842 said, sometimes we read in the press that a child wandered into the access of a pit bull and was killed. Whether that's true or not is not the point. The point is that these were just more manifestations of comments and interruptions by the Court throughout this hearing that demonstrate that the Court could not be unbiased in this case. The Court at page 897. Dog fighting is a manifestation, and again I'm paraphrasing, of mental illness. One who does this has something wrong with you. And then interrupted the government counsel's next sentence. Kids who torture dogs and cats when they're 10 years old have a problem when they grow up, and we see them in the criminal justice system. The totality of the record shows that this Court should remand for a new sentencing hearing. It doesn't matter, as this Court well knows from the case law, that if the judge was in fact biased, but this Court should reverse and remand because an objective person, an objective person might reasonably question whether the Court was impartial. Well, you know, generalizations about this read have been made for years, but it struck me that the government and the FBI agents put in some really bad stuff in this case to which an ordinary person would have a right to respond to. That's true, Your Honor. And, you know, sometimes bad facts test a court's judicious mind, but that doesn't mean that these imperfect appellants should not be entitled to the same due process as any other litigant. All right. Do you want your co-counsel to have a little time? Thank you, Your Honor. May it please the Court, I'm Michael Patrick from Chapel Hill. I represent Cedric Cook in this case. Mr. Cook's case, like I think all of the other defendants, were infected by a number of procedural problems, but I'm going to address my comments at this time to a substantive unreasonableness argument. The variance in his case was from the top of his guideline range was 21 months. He got 45 months in this case. Now, I'm not going to argue that there was no reason that the judge might have not considered going up beyond the guideline range. And the guideline itself recognizes that there are, you know, at least two situations where that might be appropriate, one of which involves extraordinary cruelty beyond the violence inherent. And there's really no evidence in this case that that applied here. And they talk about that being killing an animal, torturing an animal, that sort of thing. All the violence in this case is basically inherent to the idea. The second thing, though, the guideline intends to ---- Wasn't a dog actually shot and killed after one of these fights? Yeah, but that's typical of dog fighting where someone gets ---- Well, you just said it. That's one of the examples that might justify an elevated sentence. And that's precisely what happened in this case. The guideline itself recognizes that the animals are often killed after the fight, which is what happened in that particular case. But the guideline, in terms of an upward departure, is talking about is exceptional cruelty that prolongs the suffering, I think. And I don't want to talk about that in detail. But there was a lot of information in this case about these individuals being involved in dog fighting for a long time and that sort of thing. And if you look at that, though, the Court's case and, you know, the Supreme Court both in Gall and this case, this Court in Terry, have said you've got to justify the extent of your departure. And the judge did order, did do very specific orders in three of the defendant's cases that don't involve drugs, and that's Mr. Thompson's, Cook's, and Chadwick's. And Thompson got an upward variance of 18 months. My client got 24 months. And Chadwick got 42 months. And if you read those orders, you'll see the judge talked about, in each of those cases, all three of the defendants were longtime participants in dog fighting. They all had facilities or sponsoring fights, handling things. They all had 20 to 30 pitfalls. Most of them were malnourished because of the way you trained them. Most of them were euthanized afterwards. They were all involved in some sort of breeding. So you're saying your client got a higher sentence, but he shouldn't have gotten a higher sentence than the rest of the guys. No. My client actually got the lowest sentence of anybody. But if you look at the rationale that the judge used in his orders to explain why he might be justified giving extra time, all three of those cases are very, very similar rationality. And my point is, if you choose to. Is that an abuse of discretion? Well, if you look at those, I don't think you can distinguish why Thompson got 18 months upward variance, my client got 24 months and 42. That doesn't comply with the, I think, requirements of the court, that you have to give a reason and principle explanation. And I think you cannot read those orders and determine that there was a reasonable differentiation between the – there were reasons, but I think it comes down to the great antipathy that the judge had toward all the defendants and all who were involved in the dogfighting ones. And that's why he skipped over all the procedural issues. And, you know, he skipped over asking, giving appellate rights and other things. So he was really motivated, I think, by the antipathy. That – that exhausts my time, I believe. Thank you. Thank you. May it please the Court. I'm Camden Webb on behalf of Ronnie Jeremy Thompson. The question for Mr. Thompson on this appeal fundamentally is what was his sentence based upon. In our brief, we've argued procedural and substantive unreasonableness, but it does run back to the single question, is what is the specific basis for varying upward and the specific basis for the selection of 48 months' confinement? As Your Honor – Substantive reasonableness is what you're really challenging. I believe that is the stronger of the two arguments and really is the core of the issue, Your Honor. Mr. Thompson, through agreement with the government, agreed to a 24- to 30-month sentencing range, accepted responsibility almost immediately for his conduct, accepted an enhanced role for his conduct, which resulted in the very high sentencing range as compared to, for example, if the prior sentencing guidelines were applied and factors such as that. Despite the 24- to 30-months and the expression of remorse and acceptance of responsibility and everything else that went into Mr. Thompson's sentencing, the extent of the trial judge's comments at the hearing was, and this is that 1142 of the joint appendix, was that I also sentenced dogfighting defendants in other cases in other years. And my perspective from that experience is that in this particular case, a sentence of 48 months is appropriate. What I see in the record as a whole in the body of the evidence that Your Honors have is that Mr. Thompson was not individually considered. The variance was not individually considered. I do realize there are findings that are in the record. I view those findings as a pretty huge operation. It's pretty vicious what was going on here. I agree with that, Your Honor. It is not the best evidence to have of what your client has done. Was your client like a supervisor over everything here? No, Your Honor. He was a trainer of the animals. And the reason he agreed to the enhanced role is if you look at the sentencing guidelines, that trainer function, he had some authority over the property and all that. Much is being made about Judge Boyle's comments during the trial, which I agree with Judge Diaz. They were really out there. Did he make those before or was it after he heard evidence of the conditions and the way the dogs were treated, euthanasia necessary, that sort of stuff? Well, Your Honor, understand in this case there were two different sentencing hearings. I was in the second one. And his comments really, if you look at the record, were not as severe in the second one. They were interspersed. I believe there were – it wasn't just straight out of the box. He did hear some evidence, but they were comments that were interspersed. Granted, the evidence was significant, and the government presented lots of evidence. Our issue is the fact that what I see happen to Mr. Thompson is he kind of got lumped in with everybody as they're all like this. I think the law requires an individualized explanation of the upward variance, an individualized explanation. You don't think the written order that followed that admittedly brief comment on the record at the sentencing hearing suffices? I do not, Your Honor. There was some, as you pointed out, long-time trainer, conditioner, sponsor of dogs. He described the number of dogs found on his property, their conditions, et cetera. I mean, you might have wanted more, but why isn't that enough? Well, Your Honor, I think that I'm looking at the entire set of facts. And colored a little bit by having been there in person. And I just think that the judge selected a sentence without really looking at Mr. Thompson's scenario and situation in justifying the upward variance. I'm out of time. I will be happy to answer any other questions Your Honors have. Thank you very much. Thank you. You're the next counsel. Your Honor, may it please the Court. Seth Neihart on behalf of Mr. Chadwick. And Mr. Chadwick had a 12 to 18-month sentencing guideline range, and he was sentenced to 60 months, which is similar to a number of the ringleaders of the operation. And, indeed, the Harry Hargrove, I believe, who was a previous locally famous dogfighting defendant. In Mr. Chadwick's case, as well as an — You mean infamous? I did mean infamous, sir, yes. In Mr. Chadwick's case, like all the others, there were two basic rules, violated procedural rules. One, there was no question of whether or not the defendant had read the presentence report, and no findings actually made at the hearing with respect to, you know, the factors. You know, the findings came in written order later. With respect to Mr. Chadwick particularly, this procedural error prejudiced him greatly because there was a specific fact in the presentence report that about the length of time he was training dogs. That was erroneous. The actual correct testimony came out during the hearing. And the order used to vary him up so high was in large part based on that 35 years or used that 35 years of dogfighting wrong fact as a significant justification for his variance. So, in this case, Mr. Chadwick at least has represented to me that he, after I tried to dig it out of him, you know, did you read the presentence report? What was that? And so he really came into this unprepared. Well, that's not part of the record, obviously. That's not part of the record. Yeah. The only thing we have here is sort of the judge's failure to inquire, right? Right. And so how are we supposed to gauge that in the context of a lack of an objection? Well, you're never going to have an objection practically because if that objection is made, then that record would be fixed. When do you say this erroneous statement about his fighting dogs for 35 years versus training and raising dogs? When did that come out? It came out in the actual testimony of the case agent, and I believe I had a cite for it. I guess what I'm asking is why wouldn't that have been the time to object? Because the testimony was true in the hearing, but in the presentence report, it was the false fact. And the judge, instead of using the actual testimony of the agent, took the false fact directly from the presentence report that the agent had rebutted in his actual testimony. Well, is there a fair inference that if you're raising and training dogs for 35 years in the context of all that happened here that you wouldn't be fighting them? No, with all respect, no, Your Honor. And he had raised not just pit bulls, he had raised all sorts of different breeds, and he had talked about having different breeds, and he had been raising them not for these purposes until relatively recently. And so there is a prejudice. There is language about it being articulated on appeal, and that is showing that it's required. And I contend we have articulated the prejudice on appeal, and therefore we should get the benefit of the Court's bright-line rule that it has articulated in the case law that has been briefed to the Court. I'll reserve. Thank you. Thank you. May it please the Court? I'm Gordon Widenhouse. I represent Aaron Richardson. Mr. Richardson's appeal really comes down to a procedural unreasonableness argument that the District Court failed to consider and explain why he was rejecting several non-frivolous bases for having a sentence that didn't go on an upward departure. This Court's litany of cases that began with Leighton but is most specifically articulated in United States v. Blue is very clear that their rule is if a defendant articulates or presents a non-frivolous reason for a reduced sentence or to be considered when the Court is making its decision about an upward departure, the District Court must acknowledge that reason, that basis in its sentencing analysis. That did not happen here. There were at least non-frivolous bases for a reduced sentence that he was going to work with his dad in a landscaping business. There was evidence he had bought some equipment to do that. His mother was going to provide six months of rent, so he would be able to start that business and not have to incur the cost of rent. So that was a clear basis for a reduced sentence. It's a non-frivolous reason. And it's very clear in the Joint Appendix, particularly pages 184 and 194, where those issues are presented to the District Court. And then the District Court, both at sentencing orally and then in its written order, does not address those non-frivolous reasons for a reduced sentence at all. Let me ask you this. Do you think that our circuit has a little stronger rule than, I think, in one place it says to consider and in most of our case law we say to address? I think it's a little more stringent rule in this circuit, after Blue and the two or three cases that follow it, is that actually the District Court does have to acknowledge what the non-frivolous reason is. And as this Court has said in Blue and the other cases, if the District Court doesn't do that, there's no way for this Court on appellate review to determine whether the sentence was justified based on everything that was presented to the District Court. Does there need to be an express recitation of those non-frivolous reasons, or is it can we infer from the record that the judge heard the argument, understood the argument, but ultimately rejected it? Under Blue, this Court said in Blue, no, you can't infer that, that if it's in the — in fact, Blue says it's not enough for the defendant to be able to articulate the reasons, it's not enough for it to be in a sentencing memorandum, it's not enough for the judge to hear it or read it. The judge has to say he's considered it. Now, of course, the judge can reject it. He can find it's not strong enough, but he must articulate that in his — either in his oral sentencing or in the written order following the sentencing hearing. Otherwise, this Court doesn't know that it's followed and it's been considered. So I think under Blue and the cases that follow Blue, Mr. Richardson's entitled to a new sentencing hearing. Good morning. May it please the Court. Christine Fritz on behalf of the United States asking you to affirm the judgment of the District Court. Dehumanizing, abhorrent, and utterly without redeeming social value. That was how dogfighting was described by the House Committee in its 1976 report during which it was considering legislation to criminalize animal fighting ventures. I'd submit that some four decades later, those descriptors are exactly the same. And in this case, this judge was presented with compelling evidence of the crimes and of the depraved conduct of these defendants, and it held lengthy sentencing hearings during which everybody was allowed to articulate their position, make their arguments. At the end of those sentencing hearings, the Court arrived at individualized sentences that it tailored to each person, and those sentences are legally and factually sound. They should be affirmed in all respects. Now, I want to address first the argument that's common to all of these defendants, which is that the District Court should have sua sponte, recused himself, because of his aversion to dogfighting. And I acknowledge that there are some comments there that, as Your Honor, Judge Diaz has made, but when you look at the comments, the timing of the comments, all of the Court's comments throughout the entire thing, in the context of this case, I don't think that you can say that the judge was advocating the death penalty for all dogfighters. And if that's the — He made some pretty strong statements throughout the record, maybe not any one of them reach up to where the level was that the Court faced in Burbank. But when you look at all these comments that he's making throughout the case, both about the dogs and then at one point seemed to be talking about the owners in terms of how they should be treated. Should we be looking at this case cumulatively and determining we just don't tolerate this kind of expression by a judge who's about to sentence someone? I think that the case law is clear that judges can have opinions. They can have strong opinions. And I have to emphasize — Have you seen another one like this? I have seen the judges express strong feelings about the crimes and the conduct before it. Well, on your day-to-day in trial, you'll see it. I'm talking about the case law that comes up. Yeah, probably you hear a lot of stuff when you're in trial. But in terms of the kind of cases that we see, these kind of repeated statements here, was any of it necessary? I think, first, it needs to be put in the context that this was these — It wasn't necessary. I mean, let's all agree, none of this was really necessary. He didn't have to say any of that stuff. The words that he used, no. He did not need to use those words, and I think he was at times ineloquent. We probably could all agree some of it was at least in advice, but we're under the plain error of review. So you don't have to defend that level of it. But quite a bit is here. I mean, we don't need to go through this record and read all these comments out. I don't want to take you down the line of it, but I'm just trying to get you to acknowledge this is not something we normally like to see in cases that we handle. I don't want to get the impression, well, it's just the way judges do business. That's clearly not quite accurate, is it? No, but I think that, first of all, we need to remember that we're at the sentencing phase of this trial, and the Court made these comments after it had heard extensive evidence. In many of these comments, the Court was engaging in dialogue with the defendants and their attorney about their arguments. Was this regularly cruel versus excessively cruel? So, Berger, where you have a judge who expressed— Well, this is not Berger. Absolutely not. You don't have to go there for that. But I mean, we're dealing with cases in which the cumulative aspect of it, even at the sentencing level, the allegation being is that he should have suspended and recused himself because he had this strong level of bias. When a judge — when a motion for recusal is based upon dispositions that are developed by the Court during the course of a proceeding or based on prior proceedings, the defendant has to show that there was such a high degree of favoritism or antagonism as to make fair judgment impossible. Impossible. That is a high standard, and that is the standard that has been set by the Supreme Court in Lightkey. And then this Court in Ballew v. Leventhal talks about how opinions formed during current and prior proceedings almost never constitute a valid basis for a partiality motion. And I acknowledge that, yes, some of these comments were inarticulate, but when you look at the sentiment behind them, I don't think that the judge was necessarily focusing on something in — something controversial. For example, the idea that you can gain insight into a person's character, into their value system, into their ability to empathize by the way they treat other beings, I don't think that's very controversial. Immanuel Kant said we can judge a man's heart by the way he treats — by his treatment of animals. He said it eloquently, and Judge Boyle, I admit, did not. But it's the same sentiment. And when we're talking about how this crime has no place in civilized society, I think, quite frankly, Congress agreed with that back in 1976 when it enacted these laws. It has strengthened these laws over time. And it doesn't have a place in civil society. And the Court's comments focused on that. The Court's comments talked about how this is something that is malignant and needs to be eradicated from society. Dogfighting isn't an activity. It's not like tennis or jogging. It is something that is an attack on society. And this particular crime is of such a nature that it's more warped, more disturbing than others. And again, I don't think that that's a controversial notion. The idea that we're going to judge a society based upon whether they're going to tolerate this type of inhumane conduct, any person who was at that sentencing hearing and saw those videos and saw the exhibits that the Court saw. And I will say that throughout both of these sentencing hearings, that was something of utmost concern to this judge, that before any reviewing court, he even says, I invite scrutiny, and I want to make sure that these exhibits and these videos go up to the Court so that they understand what I'm seeing. What is the result if you find, let's consider this. If we were to say, well, these statements were pretty strong, it could be a basis for accuser. But when we look at the sentences here, we determine that, well, each one of them are proportionate and based upon each defendant's individualized conduct and history, and based upon that, we don't think the high bar is met. I think that is absolutely something that this Court could say and do, and the record supports that. And I want you to answer that, but let me back up a little bit to the question I asked Mr. Gilbert with respect to the failure to object. And he seemed to suggest that we don't get into this issue of prejudice or harm because this is somehow a structural error. What's your response to that? I disagree that this is a structural error. I think that to the extent that now on appeal, they're saying that this was so shocking that anybody, any objective person who was there would have known that this judge could not possibly be fair. I do think that they should have raised that in an objection. And I think that when you have ---- Well, is there a role for structural error when it comes to recusal? Maybe I need to go back and take a look at that. But is there ever a situation where judicial bias is so extreme that it amounts to structural error? I have ---- I'm not sure if there is. I have to say that in my research on this issue, when we're talking about a predisposition or an opinion that is formed based upon things in trial, the ---- this Court, for example, in Ballou v. Levenstall, came up with three cases across the nation which it described as having singular and starting facts, startling facts. First, you have Ballou v. Levenstall. I'm sorry. First, you have Berger, which is the German-Americans. Their hearts are reeking with disloyalty. The second case dealt with a situation where from the outset, from when these ---- when defendants were charged, the Court made clear that its intention was to recover the funds allegedly taken by the defendants. And again, that was from the beginning of the case, before guilt had been established. And then the other case that this Court found was one where it was a contempt hearing, and throughout the contempt hearing, the Court directed profanities repeatedly at defense counsel and ---- or at plaintiff's counsel and didn't allow them to respond to the contempt motion. So I haven't come across a case where it wasn't so apparent that recusal was appropriate. And I think it's tricky because what they're asking is they're saying that this judge should be recused from all dogfighting cases forevermore because he feels strongly that dogfighting has no place in society. You know, and they talk about how there was evidence about the ---- the Court was very clear that there was no child mauled in this case, that there was no walk to the neighborhood dog run. But it doesn't matter so much whether he feels like dogfighting has no place in society. The law is basically that. That is true. Because murder has no place in society. So he could be appalled at murder, too. And I would hope that he would be. I would hope that he would have opinions about individuals who have come before him. They've admitted guilt. They didn't object to the PSRs. There was extensive briefing on the motions for upward departure of variance with even more evidence than what was offered at the sentencing hearing. At that point in time, when he came into the sentencing hearing, he was familiar with these defendants' conduct. But he allowed us to put forward all the evidence. And the Court ---- and there was ample cross-examination. And I think what's interesting is the Court did engage the parties. For example, there was conversation about whether or not the dogs were aggressive to humans. When TFO Keller was testifying, the Court asked, are these dogs aggressive to humans? Basically, how does this work? If the dogs are aggressive to humans, how does this happen? And the witness said, no, they're not aggressive to their handlers because a dog that bites a referee is disqualified. But when it's something that's the same size or another dog, it's a completely different story. And then what the Court says, so it's more nuanced whether they're dangerous to humans. He's engaging in the arguments. That's exactly what you ask them to do. And ---- One of the other tests, I guess, of whether or not this is so extreme, and I think the defendants have alluded to this, is whether the judge's bias was just so ---- he was so overwhelmed by the horrific nature of these acts that he simply couldn't contemplate any mitigating factors that the defendants presented. And one of your counsel, Mr. Widenhouse, in particular mentioned his client's situation where there was some evidence of mitigation or suggestion for an alternative sentence that the judge simply never referenced or talked about. How are we to consider that in the context of this recusal motion? I do think it's a ---- they're slightly different questions. I think that the Court did take great care to have individualized portions of the parties, and then after the fact, the Court did very thorough written orders. When you look at some of the arguments that were made in Richardson's case, essentially the Court responded to the argument that this isn't ---- that this is extraordinarily cruel. For example, I believe Richardson argued that, well, the condition of his dogs were typical, or this is typical behavior. And I think that the 8th Circuit instruction ---- the 8th Circuit case in Hackman is kind of informative, because in that case, the Court said, wherever the line between ordinary and extraordinary cruelty is, these defendants have passed that. And I think that that's basically where this judge came down. And I think that some of these arguments that Aaron Richardson has made, for example, the argument that, well, I didn't train or fight the dogs. Mr. Richardson drove across the country with Andrews to pick up four dogs from a renowned breeder to drive back. Andrews paid $12,000 for him, drove back. Those dogs were intended for fighting. Added to that, in Richardson, unlike these other defendants, we had multiple bases on which we were seeking above-guideline sentences. For example, his very lengthy criminal history. I believe only one of his 31 convictions was scored. We also pointed out ---- You're saying in the Richardson case that the Court did address his non-frivolous arguments on mitigation? I think that, yes, I think that the Court engaged. I do think that to the extent that he is arguing about recidivism or trying to argue that his family's support will decrease his likelihood of recidivism, I think the Court absolutely responded to the notion of recidivism. It outwardly departed and varied because it didn't believe that a lesser sentence would effectively deter and incapacitate the defendant. So while the Court didn't necessarily say, I think that's wonderful that your family is here and that they're going to help set you up when you're done, I don't think that that's what a court needs to do. That might be laudable and that might be better, especially for me standing up here, but the Court needs to ---- you need to be confident that the Court considered the arguments that were put before him and made a judgment that is fair and reasoned, and it was the basis of its own decision-making. But the question I asked earlier was, in a vacuum, without these comments on the front end by the judge, whether we agree with them or not, perhaps that argument might be stronger. But in the context of a judge who showed such a disposition and you've made the point that you think it was entirely warranted, the question is whether or not that overwhelmed him and sort of blinded him to these alternative reasons for not varying upwards. I think that if this Court had stat-maxed all of these defendants, I would not be standing here because I would say, yes, you know what? Those comments, combined with what he did and the other things he said, give us pause. But that's not what the Court did. And throughout these different sentencing hearings, for example, in Cook's sentencing hearing, the Court said, how I've sentenced your co-defendants, it's not dispositive of what I'm going to do for you. I'm taking each person individually. And similarly, in the second sentencing hearing, when we have Thompson, the Court says effectively that I've sentenced all of your co-defendants. He was the last individual to be sentenced. I've sentenced all your co-defendants. I've heard a lot of this information. I think that based on all of this, with your circumstances, 48 months is appropriate. So I think that to suggest that the Court, in such an extensive sentencing hearing, just didn't bother to listen to what was being presented, I just don't think that's fair to Judge Boyle. And the case law says, Rita says, that it needs to be clear that the Court considered the arguments and had a reasoned basis for its decision-making. It doesn't say, and actually, Rita goes on to say that we acknowledge that the judge might have said more. He might have added explicitly that he had heard and considered the evidence and argument. The Supreme Court hasn't required the judges to go through and explicitly identify and respond to each point, because in certain cases, like this one, where there's a lengthy sentencing hearing and it's clear that the judge is very familiar with all the evidence in front of it, context and the Court's explanation make clear that it did engage in a thoughtful process. And I have confidence that individualized sentences were arrived here. And when you look at what the Court said and what the Court wrote after the fact, those are absolutely individualized. I appreciate the argument as to the guideline range, that there are certain considerations that are uniform throughout these co-defendants. But quite frankly, they were all involved in the same animal-fighting conspiracy, so that makes sense. And the upward departure provision talks about the situation where there is dog-fighting of an extraordinary scope or where there has been extreme cruelty shown. And I think that the Court focused on a number of different considerations as to why specifically he thought that this guideline range was the guideline was short-sighted, because it doesn't take into account a lot of things. It doesn't distinguish between the number of dogs, the duration of an individual's involvement in animal-fighting, the depth of the involvement. Was this an average or a typical offender as defined? The ASPCA defines a typical offender as someone who attends animal fights occasionally and has one or two dogs or a few roosters whom he uses for fighting a few times a year. That description applies to not one of these defendants. Not one. These were individuals who devoted a significant amount of their time and effort into fighting animals. They were actively involved in breeding, and some of them breeding, managing bloodlines, training, sponsoring dogs. You look at Cook's Facebook. He's spreading the gospel of dog-fighting. He's encouraging people to stick with it. He's talking about switching from leads to bungees. He is enmeshed in this. You look at Chadwick. He had that ceremonial break stick that was signed by Harry Hargrove. The date was after Harry Hargrove had been released from custody. What that says to me is that he's an individual who knew that dog-fighting was illegal, who knew you could get called up in federal court, you could do your time, and he didn't care. Same with the other individuals here. Well, you're on the subject of Chadwick. Let's talk about this issue with respect to the allegedly erroneous fact that he'd been fighting dogs for 35 years. First of all, do you think that that was incorrect as a factual matter? And if it was, what's the effect of that on his situation? I think that the testimony was clear that he said that he had been involved in raising and training dogs for some 35 years. The context in which that statement was made, he was in a yard surrounded by pit bulls who he was breeding and training to fight. I think it's a fair inference that the suggestion is that he'd been doing that for a while. But let's say that that is incorrect and that he did get into animal fighting later. That is actually something that was explored by his attorney on cross-examination and argued starting around page 888 in the JA. And defense counsel acknowledges that he admitted to getting involved in dog-fighting about 17 years ago. I have to tell you, I don't think it would have – I think a defendant is hard-pressed to show that a different outcome would have been reasonably probable in this case because you had been fighting dogs and brutalizing dogs for 17 years as opposed to 35. I think it's fair to say that you are still very deeply involved in this sport and that the blood sport, to the extent it is called that. So even giving him that, okay, so maybe he wasn't training fighting dogs for 35 years. He admitted to doing it for 17. I don't think that Judge Boyle would have perceived that to have been a reasoned basis for any sort of a lesser sentence. And the case that is relied upon when discussing the Rule 32 error, I think it's Lockhart. And in that case, it's interesting because the court did talk about, you know, it would be helpful to have a bright-line rule where the judge asks. But in that case, they went on to say that even though there was an error in Lockhart, it wouldn't have made a difference because they asked the question, what error would each have challenged if expressly asked about the PSR? Here, apparently it's whether he was engaged in dog-fighting for 35 versus 17 years. And I just think that even if that was challenged, even now they haven't really put forth anything to controvert the statement. And I just don't think that in the context of this case there was any reasonable probability of a different result. I also think that when you look at the facts in Lockhart, that was a case where the PSR was mailed and it was returned undeliverable. It was a very — so there were questions about whether the PSR had been reviewed. In a sentencing hearing like this, these defense attorneys, they were prepared. Defense Counsel for Chadwick did ask about — well, did ask them to clarify that statement. Similarly, an issue that Richardson talks about is where he was residing. That, again, was something that was focused on in cross-examination. And similarly, in terms of that being — I'm sorry, that's Thompson, not Richardson. Thompson contests whether that was his residence. In terms of that making a difference, I'd submit to the Court that it absolutely wouldn't. He acknowledged in his guilty plea and his plea papers that he was accountable for those 32 dogs. Whether he lived there or not, it didn't matter. And the evidence that he put forth — he puts forth now to contravene him living there is remarkably weak. It's a pre-services investigation report that references a sister who's not mentioned in his PSR. And you also have the statements of the cooperating witnesses. You have the aerial surveillance that put him in that dog yard. And you have him bringing three of these dogs to fights. And I believe in two of the cases with the dogs, Nancy and Uno, I think that he was in the ring with them. I think that he was actually their handler. So if we're looking at the Rule 32 errors that are being complained about, and that's raised by Chadwick and Thompson, it's a plain-error review, and there's just no reasonable probability that there would have been a different result. Andrews also does raise the Rule 32 argument. And I would point out that on 1106, Andrews' attorney actually says, we have no objections to the pre-sentence report as prepared by the probation officer. Similarly, and if I could back up with Mr. — He got a guideline sentence. He got the top of the guideline sentence, and we submit that he has waived his right to appeal his sentence. We did not move to dismiss because he did join in the common issue about recusal. But in terms of the Rule 32 alleged errors, those are the three individuals who focus on that. And I would point out that, at least with Thompson, Mr. Webb represented him both in the district court and here. And during the sentencing hearing, he says, around 1140-41, he says, we agree with the calculations in the PSR, nothing further on the actual argument. And I acknowledge that with Thompson, he was the last person who was being sentenced, and the court's commentary as to him wasn't very robust. He did say that I've compared you and your conduct in relation to the other defendants. I'd like you to look at that in the context of the fact that this — there weren't mitigating arguments, or there weren't really arguments advanced on his behalf during his individualized portion of the sentencing hearing. They acknowledged the court's previous rulings on these motions for upward variance, and they did not have anything further to add to that. And so then the court — and he said — I think it said, we understand your Honor's decision, and we have nothing further on the actual argument of the motion. And in that case, we asked for 60 months, and the court disagreed. The court gave him 48. I think there are ample indicators that the court considered these individually and arrived at what it thought was the appropriate sentence for each. And it would be a little baffling to say that his explanation was lacking, because I think he gave this case a lot of time. And he — it's not that many cases where you have written orders after the fact. I think he wanted to impress upon everybody — the defendants, this court, anybody who took a look at this case — that he took his sentencing obligations seriously, and he arrived at individualized sentencings. Thank you very much. Thank you. I ask that you affirm the judgment of the district court. You have very little time to vote. I do, Your Honor, and so I want to specifically address a couple of things that the court has brought up. First, Judge Diaz, you asked about waiver. And I concede that if you don't rule in our favor on Issue 1, that Andrews has waived his sentencing argument that we raised in whatever that issue number was in the brief. However, one doesn't waive the right to have a fundamentally fair sentencing hearing. Judge Wynn, you asked, isn't there some cases, another case that was similar to this from this court? And the one that comes to mind is United States v. Lefsey. I may be mispronouncing it, but it is cited in our brief. And that's the one where the district court — I think it was the same district court — was reversed in a trial setting where the judge continually made negative comments about the visa program and people who try to participate, constantly raising, again, folklore about the visa program that was not grounded in fact. That was the — that happened, though, in front of a jury, as I recall. Yes, sir. That was a jury trial. A little bit different context. Slightly different. But that's the case that came to mind about other outrageous comments in response to Judge Wynn's question. You also, Judge Diaz, asked about — asked some questions of the Government Counsel about structural error. And so I wanted to, again, point out to the Court, I believe that we — we did brief this between our brief and our rebuttal brief. But this — I don't believe the Supreme Court has yet said whether structural error automatically satisfies the third prong of Olano on plain error. But this Court has said it does, and there's no specific need to show prejudice in United States v. Floresca. That was where the Court found that there had been a constructive amendment to an indictment. In the United States v. David, a missing element. But by analogy, we believe that having a fundamentally flawed sentencing hearing does that. And again, there was a Supreme Court case, Rose v. Clark, that's found that a biased judge does equal structural error, and that is cited in our briefs. Thank you, Mr. Goode. Thank you very much. Mr. Mahon, you've got one minute. Just about the time it takes you to walk up here. Your Honor, with respect to an argument of counsel about the 35 v. 17 years, the range of around 15 years, although my client orally disagrees with that, but that's not part of the record, that would put him in the range relative to a lot of other defendants. And if this is being used as a reason to single him out for quadruple your range over and above other defendants, I think that's a very relevant fact, and at least it goes into the total mix. And a dispassionate judge looking at that may have come to a different outcome. Cuman O'Leary, Judge Boyle's comments displayed antagonism to the level of activism, not dispassionate judgment, but passionate zeal for retribution. To make a statement as a whole, the process itself is structural error. It affected and caused procedural errors and, in my client's case, resulted in a substantively unreasonable sentence. And for those reasons, I'd ask the Court to grant the relief we request. Thank you very much. The Court will come down and greet counsel and adjourn for today. This honorable Court stands adjourned until tomorrow morning. God save the United States and this honorable Court.
judges: James A. Wynn Jr., Albert Diaz, Henry F. Floyd